IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ANGELENA JAQUILLARD,           *
                               *
    Plaintiff,                 *
                               *
        v.                     *      CV 410-167
                               *
THE HOME DEPOT U.S.A., INC.,   *
AND JOHN DOES 3-10,            *
                               *
    Defendant.                 *

**O R D E R**

Presently pending before the Court are Angelena Jaquillard's ("Plaintiff") Motion to Exclude the Testimony of Kelly Kennett (doc. no. 31), Home Depot U.S.A., Inc.'s ("Defendant") Motion to Exclude the Testimony and Report of James Steven Hunt (doc. no. 38), and Defendant's Motion for Daubert Hearing (doc. no. 51).

**I. BACKGROUND**

This case arises from injuries Plaintiff sustained as a result of a slip and fall accident that occurred at the Home Depot store located on Victory Drive in Savannah, Georgia ("Defendant's store"). On July 3, 2008, Plaintiff was shopping in the outdoor garden center of Defendant's store when she slipped and fell in the plant aisle. Plaintiff claims that the area where she fell was wet because a vendor was watering plants a few aisles over from her location. (Compl. ¶ 12.) On June 29, 2010, Plaintiff filed suit

against Defendant in the State Court of Chatham County, Georgia alleging claims of negligence and requesting punitive damages. (Doc. no. 1 at 3.) On July 28, 2010, Defendants removed this case to the Southern District of Georgia, Savannah Division. (Doc. no. 1.)

## II. LEGAL STANDARD

Federal Rule of Evidence 702, which governs expert testimony, states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). This "gatekeeping" function must be performed with regard both to the admissibility of expert scientific evidence and to that of expert technical evidence. See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing Daubert, 509 U.S. at 589 n. 7 & 597). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility

2

under Rule 702." Id. (alterations and internal quotation marks omitted).

In determining the admissibility of expert testimony, courts must conduct a three-part inquiry to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the applications of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). Courts may consider the following factors to determine whether a specific methodology is reliable: whether the methodology can and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the scientific community. Daubert, 509 U.S. at 593-94; accord Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). This inquiry is "a flexible one," and the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594-95.

Under Rule 702, the proponent of expert testimony has the burden of showing that the testimony complies with Daubert. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005). To meet its burden as to an

3

expert, the proponent must demonstrate that the expert's proffered opinion satisfies each prong of Rule 702. Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010). Assuming that the proponent meets the basic requirements of Rule 702, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness" of the expert's testimony. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible" expert testimony. Id.

### III. ANALYSIS

#### A. Motion for Daubert Hearing

Defendant has requested a Daubert hearing, a decision committed to the Court's sound discretion. Cook, 402 F.3d at 1113. "Daubert hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." Id. (internal quotes omitted). For example, "[a] district court should conduct a Daubert inquiry when the opposing party's motion for a hearing is supported by conflicting medical literature and expert testimony." U.S. v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001). Although there are multiple expert witnesses in this case, their testimony is not particularly complicated, and Plaintiff relies on no contrary expert testimony to support her Daubert motion.

Accordingly, the Court declines to hold a hearing, and Defendant's Motion for a Daubert Hearing (doc. no. 51) is **DENIED**.

### B. Motion to Exclude the Testimony of Kelly Kennett

Defendant seeks to call Kelly Kennett, M.S. ("Kennett") as an expert witness to: (1) evaluate and provide testimony addressing the kinematics of Plaintiff's alleged fall, and (2) determine the extent to which the injury complained of by Plaintiff is consistent with the mechanics of the various descriptions of her fall. (Doc. no. 53 at 1.) Plaintiff seeks to exclude the testimony of Kennett "as it relates to the proximate cause of Plaintiff's injuries and pain" and "to the extent that [Kennett] testifies that the proximate cause of [Plaintiff's] fall was something other than the wet ground at [Defendant's store]." (Doc. no. 32 at 12-13.)

#### 1. Kennett's Qualifications to Testify about the Cause of Plaintiff's Injuries

Plaintiff does not appear to dispute Kennett's general qualifications as a biomechanical engineer.[1] Plaintiff, however, argues that Kennett is not qualified to testify about the cause of Plaintiff's knee injuries. (Doc. no. 32 at 5.) Plaintiff asserts that, as a biomechanical engineer, Kennett "does not possess the requisite medical training in order to set forth what is or what is not the precise cause of a specific injury." (Id. at 9.) In

---

[1] Kennett graduated from the University of Virginia with a Master of Science degree from the Department of Mechanical Engineering where he studied in the biomechanical program. (Kennett Dep. at 13; Kennett Report at 6.) The entirety of his work experience has been in the biomechanical engineering field. (Kennett Dep. at 10.) Including his graduate thesis, Kennett has researched and written on the implantation of load cells in the lower extremities for measurements of impact loads and on lower extremity injuries. (Id.) Within the subset of impact biomechanics, lower extremity injuries are Kennett's specialty. (Id.)

5

contrast, Defendant argues that Kennett has not made an attempt to diagnose Plaintiff's injury, but rather has assumed a diagnosis made by someone else. (Doc. no. 53 at 4-5.) Defendant contends that Kennett's testimony on causation simply opines that "the descriptions of the fall do not correlate to the Plaintiff's diagnosed injury." (Id. at 7.)

To determine whether Kennett's education, training, and experience as a biomechanical engineer qualify him to testify about the cause of Plaintiff's injuries, it is helpful to first understand what a biomechanical engineer's work entails. See Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007). Biomechanical engineers apply "the principles in mechanics to the facts of a specific accident and provide information about the forces generated in that accident." Id. (quoting Smelser v. Norfolk S. Ry. Co., 105 F.3d 299, 305 (6th Cir. 1997)). They may also "explain how the body moves in response to those forces, and ... determine what types of injuries would result from the forces generated." Id. Thus, biomechanical engineering is closely related to, and may sometimes overlap with, the field of medicine. Id.

In the context of litigation, biomechanical engineers are typically found to be qualified to render an opinion as to the forces generated in a particular accident and the general types of injuries those forces may generate. Smelser, 105 F.3d at 305; Bowers, 537 F. Supp. 2d at 1377 (finding biomechanical engineer qualified to testify to the effect of locomotive vibrations on the

6

human body and the types of injuries that may result from exposure to various levels of vibration); Berner v. Carnival Corp., 632 F. Supp. 2d 1208, 1212-13 (S.D. Fla. 2009) (finding biomechanical engineer can give an opinion as to the energy involved in a fall to the floor and whether the energy is sufficient to have caused an injury of the type that the plaintiff alleges to have suffered). Biomechanical engineers, however, are not ordinarily permitted to give opinions about the "precise cause of a specific injury." Id. "This is because biomechanical engineers lack the medical training necessary to identify the different tolerance levels and preexisting medical conditions of individuals, both of which `could have an effect on what injuries resulted from an accident.'" Bowers, 537 F. Supp. 2d at 1377 (quoting Smelser, 105 F.3d at 305).

Biomechanical engineers are qualified to testify about how forces affect or injure an individual, and Kennett, by his education, knowledge, and training as a biomechanical engineer, is qualified to testify about the forces involved here and the kinds of injuries that may have resulted therefrom. Berner, 632 F. Supp. 2d at 1213. Kennett is qualified to render an opinion in this case as to general causation, but not as to specific causation. Bowers, 537 F. Supp. 2d at 1377. Therefore, Kennett may not offer an opinion as to whether Plaintiff's fall *caused* her specific injuries. However, he may provide an opinion about the energy involved in Plaintiff's fall and if the force is *sufficient* to cause an injury of the type Plaintiff allegedly suffered. See Berner, 632 F. Supp. 2d at 1213.

### 2. Kennett's Methodology Underlying the Opinions in his Expert Report

Plaintiff argues that any testimony offered by Kennett regarding his opinion as to the cause of Plaintiff's fall should be excluded. (Doc. no. 32 at 12.) Specifically, Plaintiff argues that Kennett's "report insinuates that a possible cause of Plaintiff's fall was her choice of footwear" despite the fact that Kennett never inspected Plaintiff's footwear. (Id. at 2.) Additionally, Plaintiff argues that because Kennett has not inspected the location of the fall or taken the coefficient of friction measurements of the location, he lacks the necessary foundation to determine the cause of Plaintiff's fall.

Plaintiff's argument is largely undisputed by Defendant. In fact, in his expert report, Kennett states that he lacks sufficient information to determine the specifics of Plaintiff's fall mechanics or the available friction in the location of the fall. (Kennett Report at 4-5.) Defendant argues that Kennett's testimony is only provided to highlight the deficiencies in Plaintiff's evidence and in her expert's proposed testimony. (Doc. no. 53 at 8.)

As stated above, Kennett is qualified to testify as to matters within a biomechanical engineer's expertise, such as the forces generated in a specific slip and fall accident. Therefore, it is within Kennett's competency to describe the information that he would need to determine the exact forces involved in the accident. Kennett's expert report does not provide an alternate cause of

Plaintiff's slip and fall but merely states that he lacks the evidence necessary to determine the forces involved in this slip and fall. Accordingly, Kennett's expert report is admissible to the extent it discusses the types of information relevant to determining the cause of a slip and fall accident. To the extent that Kennett wishes to testify that there is another cause of Plaintiff's accident, he will be prevented from doing so as he has not performed the relevant testing and analysis.

### 3. Relevancy of Kennett's Testimony

Kennett's testimony is relevant because it will aid the trier of fact in determining the causation element of Plaintiff's negligence claim. Specifically, Kennett's testimony regarding whether the descriptions of Plaintiff's fall are consistent with her injuries will assist the trier of fact in determining whether Defendant's alleged negligence was the proximate cause of Plaintiff's damages. Because Kennett is qualified to testify about general causation, his methodology is sufficiently reliable for his expert report opinions, and his testimony is relevant to aid the trier of fact in this case, Kennett will be allowed to testify at trial in the manner outlined above. Accordingly, Plaintiff's Motion to Exclude the Testimony of Kennett is **DENIED**.

### C. Motion to Exclude Expert James Steven Hunt

Plaintiff seeks to call James Steven Hunt ("Hunt") to testify that: (1) allowing plant watering during the day at Defendant's store creates an unreasonably hazardous condition; (2) the plant watering should either be done only at night or, if the plants have

to be watered while customers are present, the watering area should be barricaded off from customers; (3) Defendant's warnings were insufficient because they "turn[ed] the order of the safety hierarchy upside down;" and (4) Plaintiff "did not see the water on the floor," "did nothing that was unreasonable or contributed to this incident," and "had no reason to look down at her feet." (Hunt Report at 9-10.) Defendant seeks to exclude testimony by Hunt and his expert report because Hunt's reliance on the "safety hierarchy" is unreliable under Daubert. (Doc. no. 38 at 4.)

### 1. Hunt's Opinion that Water on Garden Center Floor Constituted an Unreasonable Hazard

The Court finds that Hunt's opinion that a wet garden floor constitutes an unreasonable hazard is unreliable. Hunt has testified that he believes that any amount of water on the outside garden center floor creates an unreasonable risk. (Hunt Dep. at 82-83.) He opines that a store must maintain a "clean and dry [walking surface] when customers are in that area." (Id. at 82.)

Hunt, however, has failed to conduct any relevant tests upon the walking surface in the garden center of Defendant's store.[2] Based on the Court's review of relevant federal case law on the admission of experts in slip and fall cases, experts who are admitted to testify that a hazardous walking surface exists have performed extensive testing on the surface. See Rosenfeld v.

---

[2] The Court notes that Plaintiff argues Kennett should not be allowed to testify as to the cause of Plaintiff's accident because he has not taken any coefficient of friction measurements. This argument is also applicable to Plaintiff's own expert, Hunt, who also failed to take any coefficient of friction measurements.

10

Oceania Cruises, Inc., 654 F.3d 1190, 1193-94 (11th Cir. 2011); Great Am. Ins. Co. v. Cutrer, 298 F.2d 79, 80-81 (5th Cir. 1962)[3] (noting that both the plaintiff and defendant presented expert evidence about the coefficient of friction on the steps and sidewalk where the plaintiff slipped and fell); Santos v. Posadas De Puerto Rico Assocs., Inc., 452 F.3d 59, 64 (1st Cir. 2006) (approving the admission of expert testimony regarding the variable friction between pool steps and their edges on the grounds that it was crucial to the plaintiff's theory of the case). In fact, the Eleventh Circuit has instructed that a qualified expert who uses reliable testing methodology may testify to the safety of a defendant's walking surface as determined by the surface's coefficient of friction. See Rosenfield, 654 F.3d at 1193.

In forming his opinion, Hunt observed the garden center floor, spoke with Plaintiff regarding her fall, reviewed various pieces of literature, and read the deposition testimony of other potential witnesses. Hunt, however, did not perform objective scientific testing on the garden center floor, such as a coefficient of friction test.[4] In fact, it appears he forms his opinion that a wet outdoor garden center floor is a hazard based on what appears to be common knowledge - that water acts as a lubricant to make walking surfaces more slippery when wet. (See Hunt Dep. at 82.) The Court

---

[3] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

[4] Although it appears that Hunt measured the slope of the garden center, the only conclusion that he drew from these measurements is that the floor was sloped downwards. (Hunt Dep. at 76-77.)

11

cannot allow Hunt to attach his "expert" conclusion to an opinion that is merely based on common sense and not on a scientific method. See Smelser, 105 F.3d at 304 ("Daubert teaches that expert opinion testimony qualifies as scientific knowledge under Rule 702 only if it is derived by the scientific method and is capable of validation.")

Furthermore, to the extent that Hunt's opinion is based solely on his experience, the Court must reject it. To allow an expert to give a subjective opinion merely because he is designated as an expert would eliminate the requirement of reliability. The burden is on the proponent to explain how his experience as an expert led to the conclusion he reached, why that experience was a sufficient basis for that opinion, and just how that experience was reliably applied to the facts of the case. Frazier, 387 F.3d at 1265. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Wiggins v. Belk, No. 4-11-cv-88, 2012 WL 135595, at *5 (S.D. Ga. Jan. 17, 2012.)

Although Hunt states he has significant experience in slip and fall cases, Plaintiff fails to demonstrate how Hunt's experience provides him with a sufficient basis to form his opinions in this case. Hunt has extensive experience regarding falls in the roofing industry context. (Hunt Dep. 109-10.) Hunt also relies on his work with grocery stores to form his opinion that a dry floor is necessary for safe walking. (Id. 82.) However, Plaintiff fails to indicate how Hunt's experience with falls from heights and indoor walking surfaces translates to potential slip and falls on outdoor

12

walking surfaces. Accordingly, the lack of any relevant testing and Plaintiff's failure to demonstrate how Hunt's experience was reliably applied to form his opinion precludes Hunt from testifying that a wet garden center floor creates an unreasonable hazard.

### 2. The Safety Hierarchy as Applied to the Facts of this Case

Hunt bases several of his other opinions on his application of the Safety Hierarchy to the facts of this case.[5] These opinions include: (1) Defendant should not water the plants in the garden center while the customers are present, (2) if the plants have to be watered while the customers are present, the watering area should be barricaded off from customers, and (3) the warnings posted by Defendant are insufficient to notify customers of the wet floors. (Hunt Report at 10.) Based on a thorough review of Hunt's expert report and deposition testimony, the Court concludes that Hunt's reliance on the Safety Hierarchy in this case is unreliable.

#### a) Testability

The primary concern with Hunt's application of the Safety Hierarchy to the facts of this case is that it fails to qualify as reliable scientific knowledge or methodology under Rule 702. Hunt has not performed any testing regarding the application of the Safety Hierarchy to slips and falls nor is he aware of any testing of the Safety Hierarchy in general. In fact, during his

---

[5] Hunt describes the Safety Hierarchy as a widely accepted methodology on safety design. (Hunt Report at 11.) Based on the Safety Hierarchy, the design steps should be addressed in the following order: (1) eliminate the hazard if possible; (2) if the hazard cannot be eliminated, provide safeguarding of the hazard through design; (3) if safeguarding through design is not feasible, warn of the hazard; and (4) then set up procedures to avoid the hazard. (Id.)

13

deposition, Hunt stated that "[he] do[esn't] know if [the Safety Hierarchy] is a tested thing." (Hunt Dep. at 103.) Nor can Hunt identify the original source of the Safety Hierarchy. (Id. at 101.) Instead, Hunt declares that the Safety Hierarchy is effective because he has "utilized it [himself]." (Id. at 104.) Thus, it is clear that Plaintiff has provided no evidence that the Safety Hierarchy has been tested in a premises liability context.

### b) Peer Review or Publication

Plaintiff contends that the Safety Hierarchy has been peer reviewed as evidenced in Hunt's "Safety Hierarchy Bibliography." However, the articles listed in the bibliography appear to be predominantly focused on the heavy machinery or products liability context, and none of the titles include the term Safety Hierarchy. Furthermore, none of the articles attached to Hunt's expert report apply the Safety Hierarchy in the context of walking surfaces or premises liability. Additionally, Plaintiff fails to put forth any evidence that Hunt has ever published his theories regarding the application of the Safety Hierarchy to slips and falls or that there has ever been any peer review of Hunt's theory.

### c) Known Error Rate

There is no known error rate regarding the Safety Hierarchy in its application to this case. Plaintiff has provided no evidence of a known error rate regarding the Safety Hierarchy in any context, much less as applied to walking surfaces in a garden center. In fact, Hunt only provides assurances that he knows of

the Safety Hierarchy's effectiveness based on his own experience. (Hunt Dep. at 113.)

### d) General Acceptance Within the Scientific Community

Finally, Plaintiff argues that experts have been admitted to testify about the Safety Hierarchy in federal court in support of his claim that the hierarchy is reliable. In Martinez v. Terex Corporation, 241 F.R.D. 631 (D. Arz. 2007), the court allowed an expert to testify regarding the Safety Hierarchy as used in the field of engineering, specifically regarding machinery. Id. at 637. The court, however, determined that the expert could not testify that the defendants failed to comply with the Safety Hierarchy with respect to the machinery at issue and its warnings. Id. The court found that the expert's testimony that the machinery was "defectively and unreasonably dangerous as a result of its design and inadequate warnings" was unreliable based on Daubert. Id. at 637-641.

In fact, the Court's review of relevant case law indicates that the only contexts where an expert has been permitted to testify in federal court regarding the Safety Hierarchy have been in cases dealing with products liability claims or machinery defects. See In re Stand 'N Seal, 636 F. Supp. 2d 1333, 1338 (N.D. Ga. 2009) (noting expert in products liability case based her opinions in part on the Safety Hierarchy); Covas v. Coleman Co., No. 00-8541-CIV, 2005 WL 6166740, at *11 (S.D. Fla. May 22, 2008) (noting one of the bases that expert relied upon in forming his

15

opinion regarding defective design of a heater was his personal knowledge of the Safety Hierarchy); Martinez, 241 F.R.D. at 637 (finding expert qualified to testify regarding general principles of Safety Hierarchy in defective design of concrete mixer case). The Court can find no instance where an expert has applied the Safety Hierarchy to a walking surface in a premises liability case, much less in a slip and fall case on an outdoor garden center floor.

Furthermore, Plaintiff's assertion that the Safety Hierarchy is generally accepted because a lay witness for Defendant, Lisa Foley, recognized some of the general principles is without merit. First, Lisa Foley is not a member of the scientific community, and thus her recognition of the principles of the Safety Hierarchy does nothing to convince this Court that the Safety Hierarchy is a generally accepted method to assess and control risk in the premises liability context. Additionally, a layperson's conceptual understanding of certain assertions proposed by an expert may actually show that the suggested principles are ones that could be appreciated by the jury without the need for expert testimony. Based on the foregoing, Hunt cannot render an opinion based on his application of the Safety Hierarchy to the facts of this case.

### 3. Hunt's Opinion that Plaintiff Did Nothing Unreasonable

First, the Court notes that Hunt does not appear qualified to opine on whether Plaintiff "had no reason to look down at her feet" or that she "did nothing that was unreasonable or contributed to

the incident." (Hunt Report at 13.) Federal courts have admitted human factors engineers as experts to testify as to whether a plaintiff was aware of a condition that allegedly caused an accident. See Ahuja v. Cumberland Mall, LLC., _ _ F. Supp. 2d _ _, 2011 WL 4479216, at *4 (N.D. Ga. Sept. 26, 2011). In Ahuja, the court found that the expert's research, education, and experience in the field of human factors qualified him to offer an opinion on how a reasonable mall patron would perceive the site of the plaintiff's slip and fall accident. Id. Here, Hunt is not a human factors engineer nor does his experience as a safety consultant appear to provide him with the necessary experience to determine how a reasonable garden center patron would perceive the site of Plaintiff's slip and fall accident. (See Hunt Dep. at 117-18.)

Moreover, Hunt's methodology in reaching his conclusion is unreliable. Specifically, it appears that Hunt has no methodology. His expert report cites one source for the proposition that Plaintiff had no reason to look down at the surface she was walking on at the time of the incident. In support of this opinion, he states that "[t]he normal line of sight is about 15 degrees below the horizontal relative to the eyes" and that "[most] of the time people do not walk around looking down at their feet." (Hunt Report at 10 (citing Roger L. Brauer, SAFETY AND HEALTH FOR ENGINEERS 113 (1990)).)

When forming his opinion, however, Hunt fails to account for the numerous warning signs posted around the garden center warning customers that floors are slippery when wet and that frequent

17

watering occurs. In fact, Hunt states that a warning sign of the type Defendant posted in its garden center could provide a customer with reason to take extra caution. (Hunt Dep. at 100.) Moreover, Hunt is not aware of whether water was present on the garden center floor at the time that Plaintiff slipped and fell. (Id. 97-98.) Because Hunt fails to consider important factors in reaching his opinion, the Court finds his methodology unreliable. Accordingly, Defendant's Motion to Exclude Hunt's Testimony and Expert Report (doc. no. 38) is **GRANTED**, and Plaintiff's proffered expert James Steven Hunt is excluded.

## IV. CONCLUSION

Based upon the foregoing, Plaintiff's Motion to Exclude the Testimony of Kelly Kennett (doc. no. 31) is **DENIED**, Defendant's Motion to Exclude James Steven Hunt's Testimony and Expert Report (doc. no. 38) is **GRANTED**, and Defendant's Motion for Daubert Hearing (doc. no. 51) is **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 16th day of February, 2012.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA